UNITED STATES OF AMERICA DISTRICT COURT

WESTERN DISTRICT MICHIGAN COURT

**FILED**
April 15, 2020 11:42 AM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: __tlb__ SCANNED BY: TB /4/15/20

JENNIFER MERGOS
Plaintiff

1:20-cv-324
Janet T. Neff - U.S. District Judge
Phillip J. Green - U.S. Magistrate Judge

v.

SPACE EXPLORATION TECHNOLOGIES CORPORATION (SpaceX)
Defendant

| | |
|---|---|
| Jennifer Mergos<br>*In Pro Per*, Plaintiff<br>153 W Willow<br>Perry Mi 48872<br>1-517-512-8439 | SpaceX attn: Elon Musk<br>Defendant<br>1 Rocket Rd<br>Hawthorne, CA 90250<br>1-310-363-6000 |

## COMPLAINT

Corporations owe a duty to exercise a reasonable degree of care to protect the public from foreseeable risks that the owner knew or should have known about.

Ignoring federal and state rules and regulations to force intrusive, damaging technology on Plaintiff is reason to revoke Defendants business license and dissolve the corporation.

Defendant violates Public Trust in public spaces that are protected by Title II of the Americans with Disabilities Act, the National Environmental Protection Act, and the Michigan Environmental Protection Act.

Repeated violations of law are reason to revoke a business license and dissolve the corporation.

### PARTIES AND JURISDICTION

Plaintiff, Jennifer Mergos, lives in The City of Perry, Shiawassee County, Mi.

Plaintiff is an employed, tax-paying homeowner.

Defendant is the Corporation of SpaceX, headquartered in Hawthorne, CA.

The Federal Court has diversity jurisdiction for this civil procedure because the parties are diverse in state and involve damages in excess of $75,000. (28 U.S.C. section 1332)

The Western District Michigan Court has jurisdiction for this complaint.

## STATEMENT OF FACTS

1. Defendant has repeatedly violated Public Trust, Title II of the Americans with Disabilities Act, the National Environmental Protection Act (NEPA), and the Michigan Environmental Protection Act (MEPA), resulting in an environment where Defendant actively threatens Plaintiffs activities of daily life, use of public spaces, services and livelihood. (Exhibit #1)

2. Defendants product is harmful to the point of being non-insurable. (Exhibit #2)

3. The World Health Organization classed wireless radiation as a 2B carcinogen in 2001.

4. Defendants actions result in Plaintiffs forced exposure to a Class 2B carcinogen (same category as DDT, lead, and HIV infection). https://en.wikipedia.org/wiki/List_of_IARC_Group_2B_Agents_-_Possibly_carcinogenic_to_humans

5. Since Defendants product is so hazardous it is not able to be insured (fireworks and war are also in this category under the same insurance policy), Plaintiff should not be forced into exposure or interaction with Defendants product.

6. Defendant is forcing Plaintiffs interaction and exposure to harmful product.

7. Plaintiff does not consent.

8. According to https://www.pbs.org/newshour/show/spacex-plans-launch-of-12000-satellites-into-earths-orbit: "SpaceX's Starlink initiative....is to provide internet coverage by using thousands of satellites that beam wireless internet coverage down from space....what SpaceX wants to do is launch satellites into lower orbits so that they can beam internet at you. But, when you have satellites in a lower orbit, in order to provide that coverage, you need a lot more satellites. And so that's why SpaceX is sending nearly 12,000 satellites into into space. To provide wifi coverage."

9. Creating forced exposure to Class 2B carcinogens, causing harm to the environment and ignoring federal and state rules and regulations is reason to revoke a corporation's business license or dissolve the corporation. Especially, when wired, fiber-optic networks are already paid for by tax dollars, faster, safer, more secure, cost effective and in compliance with rules and regulations.

10. It is a legal requirement of corporations to exist within rules and regulations that have been put in place to protect the environment from harm and prevent corporations from treating American citizens like guinea-pigs for microwave radiation experiments.

11. Rooted in Roman law, the public trust doctrine recognizes the public right to many natural resources including "the air, running water, the sea and its shore." https://www.watereducation.org/aquapedia/public-trust-doctrine

12. Public Trust Doctrine refers to a common law doctrine creating the legal right of the public to use certain lands and right of ways, free from harm...The Public Trust Doctrine arises from the fact that Trust lands are special in nature physically and legally. Historically, the public use of these lands was crucial for sustenance, travel, and commerce. https://definitions.uslegal.com/p/public-trust-doctrine/

13. A public space is a place that is generally open and accessible to people. Roads (including the pavement), public squares, parks and beaches are typically considered public space. Caves, R. W. (2004). Encyclopedia of the City. Routledge. p.549. ISBN9780415252256.

14. Public property is property that is dedicated to public use and is a subset of state property.

Property law: commentary and materials. Cambridge University Press. p.207. ISBN978-0521614894.

15. State ownership is the ownership of an industry, asset, or enterprise by the state or a public body representing a community as opposed to an individual or corporation.
Public Ownership". Oxford Dictionaries. Retrieved January 25, 2018.

16. The Public Trust Doctrine provides citizens with assurances that Public Spaces will be maintained for the public good, by the Public Office via public trust and accessible to everyone in The State of Michigan for facilitating activities of daily life.

17. Plaintiff is currently excluded from use of many public services and public areas as a result of Defendants irresponsible corporate behavior.

18. This is a violation of Public Trust.

19. The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more ... major life activities," 42 U. S. C. §12102(2)(A), or as "being regarded as having such an impairment," §12102(2)(C).

20. In 2008, Plaintiff had surgery to remove a tumor from behind her left ear, where her cell phone antenna rested for 10 years (heavy cell phone use required for work >5 hrs/day, 6-7 days/week).

21. Microwave Sickness results from continuous wireless exposure.

22. In 2008, Plaintiff was diagnosed with Microwave Sickness, as recognized by the U.S. Military in 1960, also known as Electromagnetic Sensitivity (EMS).

23. Title II of the Americans with Disabilities Act applies to State government entities, and protects qualified individuals with disabilities from discrimination on the basis of disability in services, programs, and activities provided by State and local government entities.

§ 35.130 General prohibitions against discrimination
- (a) No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

24. Plaintiff experiences EMS disability in the form of severe stress- and allergy-related reactions in the presence of microwave radiation, causing significant malaise during and after exposure and deleterious effects such as migraines, tinnitus, nose bleeds, dizziness, physical pain, elevated body temperature and discomfort. Intense, longer exposure causes deeper reactions and pain. (Exhibit #3)

25. Plaintiff recently sold her home and moved to a different location in order to alleviate the symptoms she has as a result of Microwave Sickness disability, caused by over exposure to microwave frequencies.

26. EMS qualifies as a disability, by significantly curtailing life activities. EMS has been recognized as a disability by state agencies and courts across America.

27.     The US Job Accommodation Network (Department of Labor) provides a list of suggested accommodations for individuals with EMS, such as limiting exposures from WiFi sources.

28.     In 2002, the Architectural and Transportation Barriers Compliance Board, also known as the United States Access Board, issued new accessibility guidelines for recreation facilities covered by the Americans with Disabilities Act (ADA).

> "The Access Board is an independent federal agency that promotes equality for people with disabilities through leadership in accessible design and the development of accessibility guidelines and standards. Founded in 1973…"

29.     During the process of developing these guidelines, the Board held public hearings, and it received "substantial" comment from those who are electromagnetically sensitive. In its final rule, the Access Board stated:

> The [U.S. Access] Board recognizes that multiple chemical sensitivities and electromagnetic sensitivities may be considered disabilities under the ADA if they so severely impair the neurological, respiratory or other functions of an individual that it substantially limits one or more of the individual's major life activities.
> U.S. Access Board, 2002
>
> There are a significant number of people who are sensitive to chemicals and electromagnetic fields…For people who are electromagnetically sensitive, the presence of cell phones and towers, portable telephones, computers, fluorescent lighting, unshielded transformers and wiring, wireless devices, security and scanning equipment, microwave ovens, smart meters and numerous other electrical appliances can make a building inaccessible…Electromagnetic fields and radiofrequencies can jeopardize the functioning and safe access of electromagnetically sensitive individuals.
> U.S. Access Board, 2005

30.     Additionally, The ICD-10 code is the standard diagnostic tool for epidemiology, health management & clinical purposes to classify diseases and other health problems recorded on many types of health records, including death certificates. ICD 10 codes are also used by medical billers & payers for reimbursement purposes.

31.     Several codes recognize wireless exposure, which falls under non-ionizing radiation or radiofrequency. For example W 90.0 Exposure to radiofrequency is a ICD-10. ICD-10-CM Code W90.8XXS is for "Exposure to other non-ionizing radiation, sequela" [Note: sequela = late effect beyond initial treatment or acute period, a residual effect from injuries, present early, or even months or years later].

32.     The World Health Organization's *International Statistical Classification of Diseases and Related Health Problems 10th Revision* (ICD-10)-2015-WHO recognizes "Exposure to Unspecified effects of radiation, including Radiation Sickness", and exposure to "radio frequency radiation"as an external cause of severe injury that can end in death.

33.     Medical organizations are pushing to limit exposures. In the United States, the American Academy of Environmental Medicine (AAEM) recognizes EMS in a policy statement online and recommends reduction and controls of artificial electromagnetic signals "for the protection of society."

34. A Federal Court ruling on August 9th, 2019 stating a National Environmental Protection Act (NEPA) required review to determine impacts on the human environment is allowable, to account for and minimize environmental damage and climate change caused by detrimental human actions; given the rapidly accelerating detrimental climate change taking place as a result of hastily made human choices that place corporate profit over long-term environmental sustainability.

35. Defendant threatens the environment by microwaving it, as a side effect of its product.

36. The Michigan Environmental Protection Act (MEPA), Part 17 of NREPA, MCL 324.1701-.1706, authorizes courts to prevent conduct that harms the environment based on evidence presented in litigation. Under MEPA, private parties may protect the environment in much the same way as they have historically protected property and contract rights. The statute modifies the traditional view that only public agencies protect the environment. Unlike most of the statutes discussed, MEPA does not regulate through an administrative command-and-control scheme, but rather prohibits agencies from authorizing conduct that harms the air, water, or other natural resources, or the public trust in these resources.

37. MEPA authorizes any person to bring an action "for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction." MCL 324.1701(1).

38. MEPA authorizes courts to grant declaratory or equitable relief, to impose conditions on the defendant to protect the environment, or to remand a case to appropriate administrative proceedings. MCL 324.1704.

39. MEPA prohibits administrative agency authorization of conduct that may pollute, impair, or destroy the environment if there is a feasible and prudent alternative. MCL 324.1705(2).

40. Defendant is legally required to function within appropriate corporate boundaries. Ignoring federal and state rules and regulations is reason to revoke Defendants business license and dissolve the corporation.

Plaintiff does not demand a jury.

RELIEF REQUESTED

Wherefore, Plaintiff requests this court grant the following relief:

(a) order Defendant to comply with Public Trust, Title II of the Americans with Disabilities Act, NEPA, and MEPA or revoke Defendants business license and dissolve the corporation.

(b) any other relief this court deems just and equitable.

_____   /s/ Jennifer Mergos            4/14/2020 Date
153 W Willow
Perry Mi 48872
517-512-8439
jmergos@hotmail.com

SHIP

C020

110 MICHIGAN ST NW
GRAND RAPIDS MI 49503-2300

PRESS FIRMLY TO SEAL

USPS TRACKING® NUMBER

9505 5108 6417 0105 0324 84



FROM: Jennifer Mavyos
153 W. Willow
Perry MI 48872

TO:

US District Court
399 federal bldg
110 Michigan st NW
Grand Rapids MI
49503

To schedule free
Package Pickup,
scan the QR code.



USPS.COM/PICKUP

ct 2018
/2 x 9 1/2

n weight is 70 lbs. For International shipments, the maximum weight is 4 lbs.